**ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 30, 2013**
_____

**No. 13-5162**
_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**
_____

**WENDY E. WAGNER,** *et al.,*

Plaintiffs,

v.

**FEDERAL ELECTION COMMISSION,**

Defendant.
_____

On Certification from the
United States District Court
For the District of Columbia
No. 1:11-cv-08841 (JEB)
_____

# BRIEF FOR PLAINTIFFS
_____

Alan B. Morrison
George Washington University Law School
2000 H Street, N.W.
Washington, D.C. 20052
 (202) 994-7120
abmorrison@law.gwu.edu

Arthur B. Spitzer
American Civil Liberties Union
  of the Nation's Capital
4301 Connecticut Ave, N.W., Suite 434
Washington, D.C. 20008
(202) 457-0800
artspitzer@aclu-nca.org

Counsel for Plaintiffs

July 3, 2013

No. 13-5162

## CERTIFICATE AS TO PARTIES AND RULINGS

**Parties & Amici:**   Wendy E. Wagner, Lawrence M. E. Brown, and

Jan W. Miller are the plaintiffs, and the Federal Election Commission is the

defendant. The Campaign Legal Center and Democracy 21 appeared as

*amici curiae* below in support of the defendant, and, along with Public

Citizen, they have expressed their intention to appear in that capacity in this

Court.

**Rulings under Review:**  This case is before this Court for en banc

hearing pursuant to 2 U.S.C. § 437h, based on the unreported certification

order of United States District Judge James E. Boasberg that was entered on

June 5, 2013.  It is included in the Joint Appendix (JA) at 345-357.

**Related Cases:**     This case was before this Court in No. 12-5365.

On May 31, 2013, the Court vacated the rulings below and remanded the

case to be certified pursuant to 2 U.S.C. § 437h.  JA 243-262, 2013 WL

2361005.  There are no other related cases in this or any other Court.

/s/ Alan B. Morrison
George Washington University
    Law School
2000 H Street NW
Washington D. C. 20052
(202) 994 7120
abmorrison@law.gwu.edu
Counsel for the Plaintiffs

i

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES AND RULINGS ..................................... i

TABLE OF CONTENTS ................................................................. ii

TABLE OF AUTHORITIES ........................................................... iv

GLOSSARY ............................................................................. ix

INTRODUCTION ....................................................................... 1

STATEMENT OF JURISDICTION ................................................... 3

ISSUES PRESENTED .................................................................. 4

RELEVANT STATUTES AND REGULATIONS ..................................... 4

STATEMENT OF FACTS .............................................................. 4

   A. THE STATUTORY SCHEMES ................................................ 4

   B. THE PLAINTIFFS .......................................................... 13

   C. PROCEEDINGS BELOW ..................................................... 20

SUMMARY OF ARGUMENT ........................................................ 21

ARGUMENT .......................................................................... 22

   STANDARD OF REVIEW ....................................................... 23

I.    BARRING INDIVIDUALS HOLDING FEDERAL CONTRACTS FROM MAKING ANY CONTRIBUTIONS FOR FEDERAL ELECTIONS, WHILE ALLOWING OTHERS WHO ARE SIMILARLY SITUATED TO MAKE SUCH CONTRIBUTIONS, VIOLATES EQUAL PROTECTION. ........................................... 23

   A.   The Court Should Apply Strict Scrutiny, or at Least Heightened Scrutiny, to Plaintiffs' Equal Protection Claim ............................ 24

   B. Corporate Contractors and Related Persons Are Similarly Situated to Plaintiffs. ..................................................................... 28

      1. Corporations. ............................................................ 28

2. Corporate Officers, Employees and Shareholders. ................... 31

3. Individual LLCs. ............................................................... 32

C.   Federal Employees Are Similarly Situated to Plaintiffs. ............. 34

II.   BARRING INDIVIDUALS HOLDING FEDERAL CONTRACTS
FROM  MAKING ANY CONTRIBUTIONS FOR FEDERAL
ELECTIONS VIOLATES THE FIRST AMENDMENT. ............. 39

A.   As a Complete Ban on Fundamental First Amendment Activity,
Section 441c Should Be Subject to Strict Scrutiny. ...................... 39

B.   The Contribution-Contract Connection Is Too Attenuated to
Survive Any Heightened Scrutiny. ................................................ 42

C.   Section 441c Is Over-Inclusive. .................................................... 50

D.   Section 441c Is Under-Inclusive. .................................................. 55

E.   The Other Arguments in Support of Section 441c
Are Unavailing. .............................................................................. 60

CONCLUSION ...................................................................................... 63

CERTIFICATE OF COMPLIANCE...................................................................

CERTIFICATE OF SERVICE ..........................................................................

STATUTORY ADDENDUM .........................................................................

# TABLE OF AUTHORITIES

## CASES

Agency for Intern. Development v. Alliance for Open Society Intern., Inc.,

    133 S. Ct. 2321 (2013) ............................................................... 55

Arizona Free Enterprise Club's Freedom Club PAC v. Bennett,

    131 S. Ct. 2806 (2011) ............................................................... 39

Armour v. City of Indianapolis, 132 S. Ct. 2073 (2012).............................. 42

Austin v. Michigan Chamber of Commerce, 494 U.S. 652 (1990)........ 49, 56

*Blount v. SEC, 61 F.3d 938 (D.C. Cir. 1995) ........ 26, 27, 46, 47, 51, 54, 60

Board of County Commissioners v. Umbehr, 518 U.S. 668 (1996) .............. 8

Bush v. Gore, 531 U.S. 98 (2000) ................................................................ 26

Caperton v. A. T. Massey Coal Co., 556 U.S. 868 (2009).......................... 46

Citizens Against Rent Control v. Berkeley, 454 U.S. 290 (1981)............... 51

*Citizens United v. FEC, 558 U.S. 310 (2010) .. 25, 27, 31, 33, 40, 41, 50, 56

City of Cleburne. v. Cleburne Living Center, 473 U.S. 432 (1985). ..... 24, 29

City of Ladue v. Gilleo, 512 U.S. 43 (1994) ............................................... 56

Clark v. Jeter, 486 U.S. 456  (1988). .......................................................... 28

Dallman v. Ritter, 225 P.3d 610 (Col. 2010)................................... 25, 52, 53

Edenfield v. Fane, 507 U.S. 761 (1993) ...................................................... 45

Ex Parte Curtis, 106 U.S. 371 (1882) ........................................................... 7

*FEC v. Beaumont, 539 U.S. 146 (2003)............................. 24, 25, 30, 40, 41

FEC v. Massachusetts Citizens for Life, 479 U.S. 238 (1986) ............. 24, 33

FEC v. National Right to Work Committee, 459 U.S. 197  (1982) ............. 62

Filarsky v. Delia, 132 S. Ct. 1657 (2012)................................................... 35

Green Party v. Garfield, 616 F.3d 189 (2nd Cir. 2010)................... 32, 43, 47

*Authorities principally relied on are marked with asterisks.*

*Kramer v. Union Free School District, 395 U.S. 621 (1969) ......... 25, 26, 37

Lavin v. Husted, 689 F.3d 543 (6th Cir. 2012) ...................................... 42, 50

Lawrence v. Texas, 539 U.S. 558 (2003) ................................................ 16, 22

Massachusetts Bd. of Retirement v. Murgia, 427 U.S. 307 (1976).............. 25

McAuliffe v. Mayor of New Bedford, 155 Mass. 216 (1892) ..................... 8

*McConnell v. FEC, 540 U.S. 93 (2003) ............................ 24, 25, 39, 46, 51

McCutcheon v. FEC, No. 12-536, probable jurisdiction noted, Feb. 19, 2013

 ...................................................................................................... 48

Miller v. Alabama, 132 S. Ct. 2455 (2012) ................................................ 62

NAACP v. Button, 371 U.S. 415 (1963) ..................................................... 56

NASA v. Nelson, 131 S. Ct. 746 (2011) ...................................................... 35

Nashville, C. & St. L. Ry. v. Walters, 294 U.S. 405 (1935) ........................ 48

Northwest Austin Municipal Util. Dist. No. One v. Holder,

    557 U.S. 193 (2009) ................................................................... 49

Ognibene v. Parkes, 671 F. 3d 174 (2d Cir.),

    cert. denied, 133 S. Ct. 28 (2012) ...................................................... 52, 57

Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767 (1986) ................. 45

Randall v. Sorrell, 548 U.S. 230 (2006) ................................................ 41, 61

Republican Party of Minnesota v. White, 536 U.S. 765 (2002).................. 59

Romer v. Evans, 517 U.S. 620 (1996)......................................................... 50

San Antonio Independent School Dist. v. Rodriguez, 411 U.S. 1 (1973).... 25

*Shelby County, Ala. v. Holder, No. 12-96, 2013 WL 3184629

    (U.S. June 25, 2013)................................................................ 48, 49

SpeechNow.org v. FEC, 599 F.3d 686 (D.C. Cir. 2010)............................. 43

Texas v. Johnson, 491 U.S. 397 (1989)....................................................... 61

United States v. National Treasury Employees Union,

    513 U.S. 454 (1995) ........................................................................... 63

United States v. Windsor, No. 12-307, 2013 WL 3196928
    (U.S. June 26, 2013) ............................................................................ 27

**CONSTITUTIONAL PROVISIONS**

U.S. Constitution, Amend. I……………………........2, 4, 21, 22, 25, 30, 39, 42
……………………………………………………….43, 45, 48-50, 55, 59, 61, 63
U.S. Constitution, Amend. V……………….......2, 4, 21, 22, 24-7, 37, 38, 49

**STATUTES**

2 U.S.C. § 431 ................................................................................... 4, 54

2 U.S.C. § 431(13) ................................................................................ 31

2 U.S.C. § 431(8)(B)(ii) ........................................................................ 60

2 U.S.C. § 431(8)(B)(iv) ....................................................................... 60

*2 U.S.C. § 432(e)(5) ....................................................................... 8, 29

2 U.S.C. § 434(b)(3)(A) ................................................................... 31, 54

2 U.S.C. § 437g(d)(1)(A) ........................................................................ 6

2 U.S.C. § 437h .............................................................................. 3, 20

2 U.S.C. § 441b ...................................................................... 5, 8, 24, 28

2 U.S.C. § 441b(b)(2)(C) ........................................................................ 5

2 U.S.C. § 441a(a)(1) ............................................................................. 5

*2 U.S.C. § 441(c)…..………………….....1, 2, 4-6, 8-22, 26-34, 36, 38-58, 61-3

10 U.S.C. § 1091(c) .............................................................................. 16

10 U.S.C. § 2302 .................................................................................. 12

10 U.S.C. § 2304(a)(1) .......................................................................... 12

10 U.S.C. § 2305(a)(1)(B) ..................................................................... 12

10 U.S.C. § 2305(b)(1) .......................................................................... 13

10 U.S.C. § 6954(a) .............................................................................. 58

18 U.S.C. § 601 ............................................................................... 9, 42

\*18 U.S.C. § 603 ........................................................................... 7, 9, 34, 42

18 U.S.C. § 606 ........................................................................................... 42

18 U.S.C. § 610 ...................................................................................... 9, 42

26 U.S.C. § 9002(7) .................................................................................... 51

26 U.S.C. § 9002(8) .................................................................................... 51

28 U.S.C. § 1331 ........................................................................................ 20

Public Law 93-400 (1974) .......................................................................... 12

Public Law 98-369 (1984) .......................................................................... 12

Public Law 103-355 (1994) ........................................................................ 12

Public Law 104-106 (1996) ........................................................................ 12

## REGULATIONS

2 C.F.R. § 180.970 ............................................................................... 56, 58

\*5 C.F.R. § 734.208(a) ............................................................................... 34

5 C.F.R. § 734.208(b)(4)(ii) ....................................................................... 35

5 C.F.R. § 734.302(b)(3) ............................................................................ 35

5 C.F.R. § 734.303(d) ................................................................................. 35

5 C.F.R. § 734.306 ..................................................................................... 35

5 C.F.R. § 734.401 ..................................................................................... 34

5 C.F.R. § 734.404(a)(4) ............................................................................ 34

11 C.F. R. § 115.5 ............................................................................. 9, 28, 55

11 C.F.R. § 115.2 ................................................................................... 6, 40

11 C.F.R. § 115.2(a) ..................................................................................... 6

11 C.F.R. § 115.6 ................................................................................... 8, 33

48 C.F. R. §1.603-2 .................................................................................... 11

48 C.F.R. §1.601(a) ............................................................................... 11, 44

**OTHER AUTHORITIES**

86 Cong. Rec. 2563 (1940) ............................................................... 7

86 Cong. Rec. 9495-97 (1940) ......................................................... 6

86 Cong. Rec. 9496 (1940) ............................................................... 7

Amicus Brief for the United States in Hollingsworth v. Perry, No. 12-144

    (filed Feb. 28, 2013) ................................................................. 30

FEC News Release October 5, 2011, available at

    http://fec.gov.press2011/20111006postcarey.shtml ................................. 41

Federal Election Commission Advisory Opinion 2008-11 ......................... 17

http://www.propublica.org/article/pardon-attorney-torpedoes-plea-for-

    presidential-mercy ................................................................... 59

http://www.propublica.org/article/the-shadow-of-marc-rich ..................... 59

Mark Landler, "Obama Rewarded '08 Fundraisers," New York Times,

    July 25, 2012, A14 .................................................................. 59

T.W. Farnam, "Obama Gives Administration Jobs to Some Big

    Fundraisers," Washington Post, March 8, 2012, A15 ............................ 59

# GLOSSARY

| | |
|---|---|
| **ACUS** | Administrative Conference of the United States |
| **FECA** | Federal Election Campaign Act |
| **LLC** | Limited Liability Company |
| **PAC** | Political Action Committee |

**No. 13-5162**
_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**
_____

**WENDY E. WAGNER, *et al.*,**

Plaintiffs,

v.

**FEDERAL ELECTION COMMISSION,**

Defendant.
_____

**BRIEF FOR PLAINTIFFS**
_____

**INTRODUCTION**

Under the Federal Election Campaign Act, all federal contractors are

forbidden by 2 U.S.C. § 441c ("section 441c") from making contributions in

federal elections.  This case challenges the constitutionality of section 441c,

but only as it applies to plaintiffs and other individual contractors.  One of

the plaintiffs is a law professor who had a contact to do a study for the

Administrative Conference of the United States; the other two are retired

federal employees who continue to work for their former agency on a

contract basis.  Unlike every other U.S. citizen who does not have a federal

1

contract, they are forbidden by section 441c from making a contribution of even $1 to any federal candidate, political party, or political committee.

As applied to individuals such as plaintiffs, section 441c violates both the Equal Protection component of the Fifth Amendment and the First Amendment. The Equal Protection violation is based on the fact that two groups of similarly situated persons are not subject to the ban that applies to plaintiffs. The first group consists of persons closely connected to corporations that have federal contracts. Although section 441c applies to such corporations, they are permitted to establish political committees that are not subject to the ban, even though the principal rationale for the ban – the avoidance of the appearance that a contract was awarded in return for a contribution, known as "pay-to-play" – applies equally to those committees. The ban is also inapplicable to the officers, shareholders, and employees of corporate contractors, although the pay-to-play rationale applies to them at least as much as to plaintiffs. The second group consists of individuals who are federal employees; they work with, for, or supervise contractors such as plaintiffs, yet they may freely make campaign contributions that plaintiffs may not.

Section 441c also violates the First Amendment, because the absolute ban on all contributions in connection with federal elections by eligible

voters is not narrowly tailored to serve a compelling government interest, or even closely drawn to serve an important interest.  The connection between any contributions that plaintiffs might make and the awarding of federal contracts is too remote to pass First Amendment scrutiny, and the law is both over- and under-inclusive.  There is no reason why contribution limits applicable to every other U. S. citizen would not suffice to avoid any appearance that a contribution may have influenced the award of a contract, or why smaller contracts are not excluded from the ban, as other similar laws provide.  Nor is there any basis for extending the ban to entities that have no connection with the awarding of federal contracts, such as minor parties and candidates, and independent political committees with no ties to any officeholder.  Moreover, the ban fails to reach recipients of billions of dollars of federal grants whose contributions raise appearance concerns no different from any that might result from contributions plaintiffs might make.

## STATEMENT OF JURISDICTION

As discussed more fully below, jurisdiction in the District Court was based on 2 U.S.C. § 437h.  The District Court's Certification Order was entered on June 5, 2013.

3

## ISSUES PRESENTED

Does 2 U.S.C. § 441c, as applied to individuals such as plaintiffs, but not to others similarly situated, violate the Equal Protection component of the Fifth Amendment to the Constitution?

Does 2 U.S.C. § 441c, as applied to individuals such as plaintiffs, violate the First Amendment to the Constitution?

## RELEVANT STATUTES AND REGULATIONS

The relevant statutes and regulations are set forth in the Addendum.

## STATEMENT OF FACTS

### A.  THE STATUTORY SCHEMES

The Federal Election Campaign Act of 1971, 2 U.S.C. §§ 431 *et seq.* ("FECA") is a complex statute that regulates the use of money in elections for federal office.  Unlike states and localities that have many elected positions, including many that have significant roles in governmental contracting, the only elected federal offices are the President, the Vice President, Senators, and Representatives (including non-voting Delegates and Resident Commissioners).  FECA has numerous provisions relating to political contributions and expenditures, but only a few are relevant to this lawsuit.

First, 2 U.S.C. §441a(a)(1) places limits on the amount of money that any person may contribute to candidates, political parties, and political committees, as well as imposing overall limits on what an individual may contribute to all such persons in a given period.  Some of those limits are indexed for inflation, and for the 2011-12 election cycle, they were $2500 (per candidate); $30,800 (political parties, per calendar year); $5000 (political committees, per calendar year); and $117,000 (overall per election cycle). http://www.fec.gov/pages/brochures/contriblimits.shtml.  If plaintiffs prevail in this lawsuit, they would still be subject to those limitations.

Second, section 441b forbids all corporations from making contributions in federal elections, but subsection 441b(b)(2)(C) specifically allows them to finance "the establishment, administration, and solicitation of contributions to a separate segregated fund" that may make contributions the corporation itself is prohibited from making.

> Third, in relevant part, section 441c makes it unlawful for any person who enters into any contract with the United States . . . if payment . . . is . . . from funds appropriated by the Congress . . . between the commencement of negotiations . . . and . . . the completion of performance. . . directly or indirectly to make any contribution . . . to any political party, committee, or candidate for public office or to any person for any political purpose or use.

Or, in plain English, in addition to the laws forbidding bribery, it is a crime for either an individual or a corporation that has a contract with the federal

government to make a contribution in a federal election while negotiating

for, or performing, that contract.  The ban is not limited to contributions to

persons who have a role in awarding federal contracts, but extends to all

political parties and even independent ideological committees such as those

formed by the NRA, Right to Life organizations, Emily's List, and the Sierra

Club.  Violation of section 441c is a felony and, depending on the amount of

the unlawful contribution, can result in imprisonment of up to five years, or

a fine under Title 18, or both.  2 U.S.C. § 437g(d)(1)(A).  Read literally,

these prohibitions apply to state, local, and federal elections, but the FEC has

construed section 441c to apply only to federal elections.  11 C.F.R. §

115.2(a).

The contractor provision was first enacted as part of a bill that mainly

expanded the 1939 Hatch Act, which had imposed significant restrictions on

the political activities of most federal workers, to include state employees

paid by federal funds. The contractor provision was contained in section 19

in the final version of the bill, S. 3046. 86 Cong. Rec. 9495-97 (1940).

Beyond Congress' desire to keep politics and government contracting

separate, there is almost no explanation of why the approach taken in the

Hatch Act, which never included bans or even limits on contributions by

government employees, was not sufficient for contractors.  Moreover, to the

6

extent that Congress was concerned about coercion of contractors, there was no explanation of why it did not extend to contractors the approach taken in the predecessor of what is now 18 U.S.C. § 603, upheld in *Ex Parte Curtis*, 106 U.S. 371 (1882), which prohibits an individual's employer (supervisor) from receiving contributions.  Equally significant, section 13 of S. 3046 imposed $5000 limits on all contributions in connection with federal elections. 86 Cong. Rec. 9496.  Again, there is no indication why Congress did not simply apply that limit to federal contractors, or why in 1971 it did not apply FECA's general limits to individual contractors.

Part of the explanation for the ban appears to be that the prevailing constitutional doctrine in 1940 allowed Congress to impose whatever restrictions it wanted on those who accepted federal money, or as the FEC put it, on plaintiffs who "have chosen" to become federal contractors. JA 131, ¶ 2.  Thus, Senator Hatch quoted the famous observation of Justice Oliver Wendell Holmes that "[t]here is nothing in the Constitution or the statute to prevent the city from attaching obedience to [a] rule as a condition to the office of policeman and making it part of the good conduct required.  The petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman."  86 Cong. Rec. 2563 (1940) (quoting *McAuliffe v. Mayor of New Bedford*, 155

Mass. 216, 220 (1892)); s*ee also id.* at 2623 (1940) (any curtailment of

employee speech is constitutional because there is a "waiver of his

rights when he accepts the conditions attached to his employment."

That view is no longer good law, *see Board of County Commissioners v.*

*Umbehr,* 518 U.S. 668, 674 (1996), but it appears to have persuaded

Congress that any conditions it imposed were constitutional.

In 1971, FECA added what is now section 441b(b)(2)(C), which

expressly permits corporations to establish "separate segregated funds"

("PACs") that can be used to make contributions from funds solicited from

the corporation's officers and shareholders. Then in 1976, it added

subsection 441c(b), to enable corporate contractors, like all other

corporations, to establish such PACs.  As a result, while large government

contractors like Boeing or IBM are barred from making contributions for

use in federal elections, their PACs, which, under 2 U.S.C. § 432(e)(5),

must "include the name of its connected organization" (*i.e.,* Boeing PAC),

are free to make contributions for that purpose.  In addition to the PAC

exclusion, the FEC has construed section 441c not to apply to shareholders,

officers, or employees of federal contractors.  11 C.F.R. §115.6.  These

exclusions apply to all corporations, large or small.  Thus, Boeing's CEO

and its chief contracting officer are not subject to the ban of section 441c,

nor is someone who is the sole owner, officer, and employee of a limited

liability company (LLC) that has a personal services contract with a federal

agency. No similar alternative exists for individual contractors, even if they

want to establish a political fund using only money obtained from sources

other than a federal contract. The FEC has made it clear that section 441c

applies to any contribution whether "from their business, personal, or other

funds under their dominion or control." 11 C.F.R. § 115.5; JA 62 (response

of FEC to plaintiff Brown's request for advisory opinion).

The contribution ban, moreover, is inapplicable to individuals whose

contract with the federal government is one of employment. As noted

above, 18 U.S.C. § 603 restricts who may "receive" contributions from

federal employees, but its narrow scope underscores the contrast with the

ban in section 441c. Similar anti-coercion laws include 18 U.S.C. § 601,

which makes it a crime for anyone "to cause any person to make a

contribution . . . for the benefit of any candidate or any political party, by

means of the denial or deprivation, or the threat of the denial or deprivation,

of . . . employment, position, work, compensation, payment, or benefit" from

the federal government, and 18 U.S.C. § 610, which criminalizes attempts to

coerce federal employees to engage in political activities. In addition, there

are a few rules that impose additional restrictions on employees of

9

designated sensitive agencies, such as the FEC, FBI, and CIA, but none of them includes a ban on all contributions, or applies to contributions to political parties or independent committees, as does 441c. *See infra* at 34-35.

Finally, section 441c does not apply to other similar financial transactions through which the Government makes substantial payments to individuals, who might believe that making a political contribution would enhance their chances of obtaining such a payment. Most significantly, section 441c excludes federal grantees, who receive more total annual federal dollars than do contractors (JA 193, p. 38), as well as recipients of loans, guarantees and similar financial benefits. Nor does any law forbid major campaign donors and fundraisers from seeking high level federal employment (such as ambassadorships) in gratitude for their help in winning an election, despite the obvious potential for pay-to-play or its appearance.

The most significant point about section 441c is that Congress never focused on the vastly different treatment that it had created for individuals with federal contracts, on the one hand, and corporate contractors (through their PACs, officers, shareholders, and employees), as well as federal employees, on the other. Whether a court might owe any deference to this haphazard scheme if Congress had actually shown its awareness of the

consequences is a question that this Court need not address, because there is

no doubt that this scheme grew to its present form by accident, not design.

Section 441c appears intended to prevent would-be contractors from

making contributions to officials who award federal contracts. But the only

federal officials covered by section 441c are the President, Vice President,

and Members of Congress, none of whom has any formal role in contracting.

Pursuant to 48 C.F.R. §1.601(a), the heads of federal agencies are vested

with contracting authority, which they may, and generally do, delegate to

others. And the unrebutted evidence in this case is that appointed agency

officials, not elected officeholders, actually made the relevant contract

determinations for these plaintiffs. *See infra* at 44-45. Moreover, as

explored at great length by the FEC in its deposition of Professor Steven

Schooner, the federal procurement system is designed to be apolitical, so

that all decisions are made on the merits by appointed, not elected officials

(JA 196-97, pp. 51-54). As Prof. Schooner further explained, in the vast

majority of cases, the current system is immune from political interference

by elected officials and their political parties. *Id*. In part, this is due to the

role played by contracting officers, whose selection process is based on their

knowledge and experience in federal contracting. JA 217, pp. 133-36; *see* 48

C.F. R. §1.603-2.

11

One other point is significant about the relation between section 441c and the federal procurement system today: section 441c as applied to individuals is unaltered since 1940, but the contracting system has undergone massive changes. The enormous increase in the use of federal contractors for a multitude of purposes caused Congress to enact major legislation to manage the procurement process. Statutes governing the modern federal procurement system were enacted for military agencies in 1948 (the Armed Services Procurement Act, 10 U.S.C. § 2302 *et seq*.), and for civilian agencies in 1949 (the Federal Property and Administrative Services Act, Pub. L. 103-355, Title X). Those statutes, in turn, have been significantly modified over the years, most notably by the Office of Federal Procurement Policy Act of 1974, Pub. L. 93-400; the Competition in Contracting Act of 1984, Pub. L. 98-369; the Federal Acquisition Streamlining Act of 1994, Pub. L. 103-355; and the Clinger-Cohen Act of 1996, Pub. L. 104-106, Divisions D & E. Included in those laws (as amended from time to time) are various specific protections against the kind of pay-to-play abuse that section 441c is supposed to prevent. *See, e.g.,* 10 U.S.C. § 2304(a)(1) (agencies must award contracts after full and open competition, unless exception applies); 10 U.S.C. § 2305(a)(1)(B)(agencies must use specifications that do not unduly restrict competition); 10 U.S.C. §

12

2305(b)(1) (agencies must evaluate offers based only on the specifications and evaluation criteria set out in the solicitations, and bidders who contend that the agency deviated from those specifications and evaluation criteria – such as by favoring a firm whose PAC made political contributions – may file a bid protest at GAO or in the Court of Federal Claims). Thus, even if a pay-to-play rationale might have made section 441c defensible in 1940, the vast changes in federal procurement since then have made it indefensible on that basis today.

## B.  THE PLAINTIFFS

When this case was in the District Court, the three plaintiffs served as consultants to federal agencies under contracts that made them subject to the ban in section 441c.  Each was eligible to vote in the 2012 federal elections. JA 349, ¶ 3.  Prior to becoming a consultant, each made contributions to candidates for federal offices and/or to political parties and political committees, either in their own names or jointly with their spouses.  *Id. ¶ 2.* Each wished to make federal contributions in 2012, *id*, but section 441c would subject them to criminal prosecution if they did so.

**Plaintiff Wendy Wagner** is a professor at the University of Texas Law School.  Her principal area of scholarship is the law-science interface in environmental law.  JA 349, ¶ 5.  She had a contract with the Administrative

13

Conference of the United States ("ACUS") under which she was paid $12,000 to prepare a report and recommendations on potential improvements in the use of science by administrative agencies in rulemaking, adjudication, and/or other agency functions. *Id.* ¶¶ 5-6. ACUS regularly hires academics, primarily law professors, to do studies in connection with the preparation of draft recommendations on which ACUS will debate and vote. JA 69, ¶ 4 (Declaration of Jeffrey Lubbers, former Research Director for ACUS). As with most ACUS consultants, the agency staff identified Professor Wagner based on her expertise and the scope of the proposed project, and approached her to determine her interest and availability. JA 50, ¶ 3. The agency's choice of consultants, as well as the amounts to be paid and other terms of the contract, are determined by the Chairman and the staff, none of whom is an elected federal officer. The choice between using staff and outside consultants for a project is affected by timing, budget, and the availability and expertise of ACUS employees. JA 69-70, ¶¶ 4, 6.

Plaintiff Wagner is registered to vote in Texas. She wanted to make political contributions for the 2012 federal elections, but the ban in section 441c precluded her from doing so. Although her contract with ACUS has

concluded, she expects to have future agency contracts that will subject her to section 441c.  JA 350, ¶ 5.[1]

The applicability of section 441c to Wagner is hardly unique; it extends to all individuals who contract in all of the following circumstances: (a) the individual is hired by an agency, such as the Department of Justice, or by a federal court, to be an expert witness in either administrative or court litigation; (b) the individual is an attorney hired to represent the United States, a federal agency, officer, or employee, where the Department may have a conflict of interest; (c) the individual is hired by the Judicial Conference or another entity within the Judicial Branch to be a reporter for one of the Rules Committees or to provide training to judges; (d) the individual is hired to provide advice in law, medicine, the hard or social sciences, or any other area where the government lacks the necessary expertise among its officers or employees; and (e) the individual is hired to provide translation or interpretation services in federal court or before a federal agency.  JA 106 (Request for Admission # 4).  It also reaches

---

[1] On June 14, 2013, ACUS approved the recommendation based on Professor Wagner's Final Report. http://www.acus.gov/recommendation/science-administrative-process.  Her report of 159 pages, for which she was paid about 75 cents a page, plus appendices of another 246 pages, is available at http://acus.gov/sites/default/files/documents/Science%20in%20Regulation_Final%20Report_2_18_13_0.pdf.

15

personal services contracts made by the Defense Department to obtain needed physicians and other health professionals, whose hiring is subject to specific procedures designed to avoid political or other irrelevant considerations.  10 U.S.C. § 1091(c).

There is another important aspect regarding the hiring of Wagner and many (although not all) of the individual contractors who are subject to section 441c.  For most large government contracts, there is an open process by which interested persons can apply and their applications are assessed according to the terms of the proposal.  However, contractors like Wagner and Professor Schooner, who has served as an expert witness, mediator, and special investigator (JA 191, pp. 29-30), typically do not apply for a contract or even know that there is a contract to be let (*id.*, p. 32; JA 216, pp. 130-132).  Instead, they are initially approached by an agency because the agency has concluded that they are able to fill a particular need.  For them, the pay-to-play rationale is even more inapplicable than it is for contracts let out for bids.

**Plaintiff Lawrence Brown** was for many years a full-time employee of USAID and its predecessor agency.  After he retired, he worked in the private sector until he entered a contract with USAID to become a Senior Human Resources Advisor.  JA 350, ¶ 7.  In that capacity he supervises

16

three civil service employees and one contract employee and works with

civil service employees and other advisors under contracts similar to his,

under the overall supervision of agency officials. JA 55, ¶ 4. There is no

functional distinction between the work performed by employees and

contractor-advisors. *Id*.

Brown's current contract began in October 2011, and lasts two years,

renewable at the option of USAID for three additional years. Like all of his

contracts with USAID, he negotiated it with agency officials, none of whom

is an elected officeholder. He earns sick leave and vacation pay like regular

employees. Federal taxes are withheld from his paycheck, and the agency

pays the employer's share of Social Security and Medicare taxes. *Id., ¶* 5.

Before Brown became a contractor, he was unaware of the ban in

section 441c. Because of the ban, he has made no contributions in

connection with federal elections although he previously did so. *Id.*, ¶ 6.

Because everyone at USAID treats him the same as a regular employee, he

considers it only fair that he be allowed to make contributions. Accordingly,

in August 2008, he submitted a request for an Advisory Opinion to the FEC

asking that he be allowed to make political contributions, subject to the same

limitations applicable to employees. JA 56, ¶ 7. The FEC rejected his

request in Advisory Opinion 2008-11. JA 60. Brown is registered to vote

in Maryland; he wanted to make contributions in 2012, but was prohibited from doing so by section 441c.  JA 56, ¶ 8; JA 83.

**Plaintiff Jan Miller** is a lawyer who spent his career working for the federal government, mainly for the Office of General Counsel at USAID and its predecessor.  After he retired, he continued to work for the agency in an employee status as a reemployed annuitant-consultant.  JA 350, ¶ 8. He also began to provide legal advice to the Peace Corps, where he continues to work as an employee and accrues annual and sick leave.  JA 64-65, ¶¶ 2-4.

Miller has a contract that runs until 2016 with the Office of HIV/AIDS in the Global Health Bureau of USAID, where he provides policy advice.  He earns vacation and sick leave, as he did when he was an employee, and the agency continues to treat him as an employee for federal tax purposes, paying the employer's share of Social Security and Medicare. *Id.*, ¶ 5.  It is Miller's understanding that USAID currently has approximately 700 individuals under personal services contracts, which are generally similar to his, with one-third of those individuals working in Washington and two-thirds at USAID missions overseas.  *Id.*

All of the contacts that Miller has had in negotiating and/or implementing his contracts with USAID were with agency contracting officers, none of whom was an elected officeholder.  *Id.*, ¶ 6. His selection in

18

each case was, he believes, based on the agency's knowledge of his work and because agency officials concluded that he had the necessary skills, experience, and familiarity with its work so that he could step in and do what was needed.  *Id.*  In each of the situations in which he has been a contractor-consultant, and in many of the positions in which he was an employee, he worked side-by-side with employees and contractual-consultants.  The nature of the work performed by such individuals rarely varied depending on whether the person was an employee or a contractor; sometimes the supervisor was an employee or officer, and in other cases, the supervisor was a contractor-consultant. *Id.*

Miller currently works in the mornings for USAID as a contractor, subject to section 441c, and in the afternoons for the Peace Corps, as an employee, not subject to section 441c.  JA 66, ¶ 7.  Miller has not made any federal contributions since he became a contractor, but wanted to provide financial support in 2012 for candidates for federal offices and/or their political parties, and be on record as giving money to those that he believes would best represent him and his views and values.  *Id*.

 Plaintiffs Brown and Miller are, for all practical purposes, federal employees.  Among the many others in the same category are retired FBI

19

agents who are hired to do background checks on those applying for federal employment or who need a security clearance.  JA 351-52, ¶ 11.

## C.   PROCEEDINGS BELOW

This lawsuit was filed in October 2011 under 2 U.S.C. § 437h, under which the District Court would have certified the facts and the questions presented, but all rulings on the merits would have been made by this Court sitting en banc. Because plaintiffs wanted to make political contributions in 2012, and because they and the FEC believed that jurisdiction was also proper under 28 U.S.C. § 1331, they filed an amended complaint (JA 8) and moved for a preliminary injunction, which was denied in April 2012.  JA 24-49.  Thereafter, the parties concluded discovery and filed cross-motions for summary judgment.  In its opinion of November 2, 2012, the Court upheld section 441c.  JA 224-242.

Plaintiffs appealed, and a panel of this Court ruled that jurisdiction under section 437h was exclusive (JA 243-61) and remanded so that the District Court could make the required certifications, which it did on June 5, 2013.  JA 345-57.[2]

_____

[2]  On remand, the FEC submitted 54 pages of proposed findings of fact, JA 276-329, of which the final 113 items were "legislative facts." The District Court limited its findings to facts about the plaintiffs and some background on the federal contracting process, but recognized that the FEC may cite public documents noted in those legislative facts in its brief.  JA 348.  The

## SUMMARY OF ARGUMENT

The principal justification for section 441c is that a ban is needed to avoid the appearance that federal contractors are using contributions to obtain contracts, known as pay-to-play. But that rationale also applies to those not subject to the ban: the political committees of corporate contractors and the corporation's officers and shareholders, who are subject only to the generally applicable limits on contributions. The same rationale applies to federal employees, who are indistinguishable in all relevant respects from individual contractors like plaintiffs, but not subject to the ban. This discrimination against plaintiffs in the exercise of the First Amendment right to make political contributions cannot survive Equal Protection scrutiny.

Even if section 441c were non-discriminatory, it would still fall under the First Amendment, for three reasons. First, the connection between the would-be recipients of plaintiffs' contributions and the awarding of federal contracts is far too remote to satisfy the applicable standard that the law be at least "closely drawn" to sustain its asserted goal, in this case avoiding the appearance of pay-to-play. Second, section 441c is far broader than necessary, both because it covers contributions to independent political

parties have agreed that they will not object to citations to other portions of the record below, including the opinions of the District Court that have been vacated.

committees and minor parties that have no connection with the contracting

process, and because it fails to exclude small contributions that no

reasonable person would believe raise the appearance of pay-to-play.  Third,

the law is vastly under-inclusive, failing to cover transactions, such as the

billions of dollars spent yearly on federal grants, that are at least as

susceptible to the pay-to-play perception as plaintiffs' very modest contracts.

Whatever the law may tolerate for purely economic regulation, the First

Amendment does not permit such imprecision.

## ARGUMENT

Plaintiffs urge this Court to consider their Equal Protection claims

first for several reasons: (1) Section 441c applies to corporations as well as

individuals, and a First Amendment ruling would call into question its

continued viability for corporate contractors, whereas an Equal Protection

decision would leave that issue for another day.  (2) An Equal Protection

ruling would give Congress greater flexibility since it could either extend the

ban (or something comparable) to others, or relax it as to plaintiffs; a First

Amendment decision would leave Congress with no such choice. (3) Equal

Protection rulings are by definition more narrow, as illustrated by Justice

O'Connor's concurring opinion in *Lawrence v. Texas,* 539 U.S. 558, 579-85

(2003), which would have invalidated Texas' ban on sodomy because it

applied only to same-sex conduct, whereas the majority struck down the law on Due Process grounds, which overturned all anti-sodomy laws, even those that treated same-sex and opposite-sex conduct alike.

### Standard of Review

This case is before the Court for an initial determination based on certified facts, as to which there is no dispute. The applicable level of scrutiny for plaintiffs' claims is set forth in the discussion of each claim.

## I. BARRING INDIVIDUALS HOLDING FEDERAL CONTRACTS FROM MAKING ANY CONTRIBUTIONS FOR FEDERAL ELECTIONS, WHILE ALLOWING OTHERS WHO ARE SIMILARLY SITUATED TO MAKE SUCH CONTRIBUTIONS, VIOLATES EQUAL PROTECTION.

There are two groups of persons who are similarly situated to plaintiffs but who are allowed to make federal campaign contributions. The first is comprised of three sub-groups, each of which involves a corporation that has a federal contract: (i) the corporation itself, because it may establish a PAC that may make federal contributions; (ii) its officers, employees and shareholders; and (iii) the individuals who control LLCs that contract with the federal government. The second group includes individuals who work for federal agencies as employees rather than contractors. Because the comparisons and justifications are different for the two groups, it is important to consider them separately.

### A. The Court Should Apply Strict Scrutiny, or at Least Heightened Scrutiny, to Plaintiffs' Equal Protection Claim.

Although the Supreme Court has well-established standards for assessing Equal Protection claims in many contexts, its cases involving bans on contributions have not been analyzed under the Equal Protection Clause, under which "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 439 (1985) (striking down law under rational basis standard). In *FEC v. Beaumont*, 539 U.S. 146 (2003), there was a lurking Equal Protection contribution question: whether certain non-profit corporations should be treated like individuals – as the Court had done in allowing them to make unlimited independent expenditures, *FEC v. Massachusetts Citizens for Life,* 479 U.S. 238 (1986) – or like for-profit corporations, which are prohibited by section 441b from making any contributions in federal elections. Similarly, in *McConnell v. FEC,* 540 U.S. 93, 231-32 (2003), the contribution ban at issue applied only to individuals under the age of 18, which could have been treated as an Equal Protection violation. However, neither case was decided under Equal

24

Protection law, with the Court sustaining the law in *Beaumont* and striking it down in *McConnell.*[3]

Pursuant to *San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973), strict scrutiny is required when a law "operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution." Under *Buckley v. Valeo,* 424 U.S. 1 (1976), the right to make a political contribution is a fundamental right protected by the First Amendment; *see also Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 312 & n.3 (1976) (pointing to "rights guaranteed by the First Amendment" as an example of fundamental rights requiring strict scrutiny). And while the Court in *Citizens United v. FEC,* 558 U.S. 310 (2010), did not decide the level of scrutiny applicable to contributions, its broad embrace of strict scrutiny as applied to political spending further supports applying strict scrutiny to laws that allow some persons to contribute, while banning others from doing so.

Similarly, the Court in *Kramer v. Union Free School District,* 395 U.S. 621, 626 (1969), gave a restriction on voting "a close and exacting examination" because the law allegedly created an "unjustified

---

[3] In *Dallman v. Ritter,* 225 P.3d 610, 634-35 (Col. 2010), the Court found the differing treatment of union contractors and corporate contractors violated Equal Protection, applying the "narrow tailoring" standard.

discrimination in determining who may participate in political affairs. . . ." And, in *Bush v. Gore,* 531 U.S. 98, 104-05 (2000), without specifying the level of scrutiny, the Court gave no deference to Florida's method of conducting a recount, which it found amounted to "arbitrary and disparate treatment" by valuing "one person's vote over that of another," which is essentially what section 441c does by denying plaintiffs the same right to make political contributions that all other citizens enjoy.  Strict scrutiny therefore applies to plaintiffs' Equal Protection claim, and the ban should be set aside unless defendant can show that section 441c is "necessary" to serve a "compelling state interest" as applied to individuals such as plaintiffs and is "narrowly tailored" to achieve that end.  *Kramer,* 395 U.S. at 630-33.

    In *Blount v. SEC,* 61 F.3d 938 (D.C. Cir. 1995), this Court rejected an Equal Protection challenge to one aspect of an SEC rule that restricted the ability of municipal securities dealers to contribute to the political campaigns of state officials from whom they obtained business.  That rule (unlike section 441c) reached dealers' corporate officers, but the challengers contended that it violated Equal Protection because it did not also extend to the officers of a dealer's parent corporation and the parent's political committees. This Court rejected the claim of under-inclusion, recognizing that the SEC could sensibly stop somewhere and, with little analysis, applied

rational basis to that line-drawing. *Id*. at 946, n.4. Given the overall thrust of the rule, that outcome is hardly problematic since its principal impact was on the economics of the municipal securities industry, a matter well within the special competence of the SEC. There is also a question as to whether the opponents of the rule raised this issue before the SEC, so that the agency had an opportunity to respond. *See id*. at 940-41. For these reasons, *Blount* is inapplicable here.

Although declining to specify the applicable level of scrutiny, the Court in *United States v. Windsor,* No. 12-307, 2013 WL 3196928 (U.S. June 26, 2013), stated that "careful consideration" was required of the claim that treating same-sex married couples less favorably than opposite-sex married couples violated Equal Protection because of the "unusual" nature of the differing treatment of marriage. *Id*. at *14. That rationale surely applies here where section 441c treats the PACs of corporate contractors more favorably than individual voter-contractors like plaintiffs, which essentially turns the arguments made by the FEC in *Citizens United* on their head. Accordingly, the Court should decline to apply rational basis as the FEC urged and instead utilize strict scrutiny, or at least heightened scrutiny, under which the "statutory classification must be substantially related to an

27

important governmental objective." *Clark v. Jeter,* 486 U.S. 456, 461 (1988).

### B. Corporate Contractors and Related Persons Are Similarly Situated to Plaintiffs.

### 1. Corporations.

The first similarly situated group consists of corporations that contract with federal agencies. Like plaintiffs, they cannot make contributions in federal elections. But, like other corporations, they can establish PACs that can make contributions, and the corporate sponsor is specifically allowed to administer the fund, including paying for the solicitation of money to be used to make contributions. Section 441b(b). Plaintiffs do not have that option. The ban in section 441c does not simply forbid an individual from using money received under a government contract from making a contribution. It is absolute and not tied in any way to the source of the money, *see* 11 C.F.R. § 115.5; *see also* JA 62 (FEC advisory opinion). Thus, if an individual inherited $10,000 and placed it in a separate segregated fund before becoming a government contractor, section 441c would still bar the use of those funds to make contributions in federal elections, while a corporation can use "outside" (non-treasury) money to fund its PAC (including money paid to stockholders or executives out of profits on the corporation's government contracts).

28

The asserted purpose of section 441c is to eliminate the appearance of a *quid pro quo* for government contracts. It does that by banning contracting parties from making contributions to persons who, in least in theory, are in a position to influence the award or terms of such contracts. But permitting contracting corporations to create PACs to make identical donations thoroughly undermines that rationale and actually places corporations in a *better* position to influence the award of government contracts than individual contractors like plaintiffs.

To be sure, a corporation and its PAC are separate legal entities. But that fact has no relevance because the comparisons between plaintiffs and contractor PACs must be judged in light of "the purpose that the challenged laws purportedly intended to serve." *City of Cleburne,* 473 U.S. at 454 (Stevens, J. concurring). The asserted purpose of section 441c is to prevent the reality or appearance of pay-to-play, but that same reality or appearance exists if the Boeing PAC makes a contribution. Indeed, to eliminate any question about the connection between a corporation and its PAC, section 432(e)(5) requires that a PAC's name "shall include the name of its connected organization." As the United States recently observed, "Under heightened scrutiny, however, a court evaluates the fit between a proffered interest and the challenged classification not in isolation or in the abstract,

but in the context of the regulatory regime as it actually exists. … Petitioners cite no precedent requiring (or even permitting) a court to shut its eyes to the actual operation and effect of the law in context."  Brief for the United States in *Hollingsworth v. Perry,* No. 12-144, 2013 WL 3196927 (U.S. June 26, 2013), at 23 (citations omitted).

The notion that corporations should have greater rights than individual voters is impossible to square with *Beaumont*, where the Court upheld the ban on corporate contributions.  As the Court observed, "Within the realm of contributions generally, corporate contributions are furthest from the core of political expression, since corporations' First Amendment speech and association interests are derived largely from those of their members and of the public in receiving information. A ban on direct corporate contributions leaves individual members of corporations free to make their own contributions, and deprives the public of little or no material information." 539 U.S. at 161 n.8 (citations omitted).  Yet under section 441c, these individual contractors are not free to make their own contributions – even with money not derived from their federal contracts – while corporate officers and shareholders are at liberty to use even funds derived from their federal contracts to support their corporations' PACs.

In *Citizens United v. FEC*, *supra*, the FEC defended a law that favored individuals over corporations and lost.  We know of no other law in the field of campaign finance that favors corporations over individuals, let alone one that has been sustained.  Because section 441c prefers corporations over individuals, it cannot stand.

### 2. Corporate Officers, Employees and Shareholders.

Not only may corporations use their namesake PACs to make contributions, but individuals closely affiliated with corporate contractors are outside the ban.  Thus, the CEO of Boeing, its largest shareholders, its chief contract negotiator with the Department of Defense, its congressional lobbyists, and its employees in charge of implementing a DOD contract, may all make contributions in federal elections.  If the supposed concern about the appearance of a *quid pro quo* for a federal contract would not exist in that situation, even though the identities and employers of contributors are matters of public record, *see* 2 U.S.C. §§ 431(13); 434(b)(3)(A), it is impossible to explain why plaintiffs who have individual contracts with federal agencies should be forbidden from making similar contributions.  Indeed, the FEC cites as evidence of the potential for corruption examples from New Mexico, Hawaii, the District of Columbia, and New York City where officers of government contractors were the lavish contributors (JA

31

299-307, ¶¶ 37-53), precisely what section 441c allows.  *See also* JA 234
(District Court Opinion citing similar examples).  Indeed, *Green Party v.
Garfield,* 616 F.3d 189, 202 & n.10 (2nd Cir. 2010), cited by the FEC (JA
310, ¶ 60), makes this very point in upholding a ban on contractor
contributions that covered the contractor's officers and their dependent
children, as well as its PAC, because making the law applicable to
"principals" of contractors is "particularly important."

### 3.  Individual LLCs.

The discrimination against individual contractors does not end there.
As shown by the declaration of Jonathan Tiemann, who has an expert
witness contract with the Department of Labor, some individuals who
perform personal services contracts for the federal government choose to
incorporate and establish LLCs.  JA 78, ¶ 5.  In his case, and in most others -
*see* Lubbers and Schooner declarations JA 71, ¶ 8; JA 74, ¶ 8 - the agency
does not care whether the contract is with the individual personally or with
an LLC.  In most contracts with LLCs, the person performing the services is
the sole shareholder, officer, and employee; agencies contract with such
LLCs on the understanding that the individual who owns and runs the
corporation will perform the services.  For operational purposes, it makes no
difference to the agency whether an individual has formed an LLC or enters

a contract with the agency directly.  But it does matter under section 441c because the FEC has ruled that the ban on contractor contributions applies only to the entity that is the contracting party, not to its shareholders, officers, or employees. 11 C.F.R. § 115.6.

Thus, if plaintiff Wagner were willing to go to the trouble and expense of setting up and maintaining an LLC and contracting in its name (*see* Tiemann declaration, JA 76, ¶ 3), she could make all the contributions federal law would allow, and section 441c would be no barrier even if the sole source of her contributions was her earnings under her government contract.  But the idea that she should have to create an LLC to avoid section 441c is foreclosed by the rationale of *Citizens United,* which rejected as unduly burdensome a claim that even large for-profit corporations could be required to establish PACs as an alternative to making expenditures from their treasuries, without any showing of the specific burdens of doing so. 558 U.S. at 337-39; *see also FEC v. Massachusetts Citizens for Life,* 479 U.S. 238, 253-56 (1986) (rejecting similar claim as applied to non-profit corporations and explaining the burden of operating such funds).  It follows that an individual who wishes to make otherwise lawful political contributions may not be required to spend the time and money to establish and maintain an LLC just to avoid section 441c.

## C.   Federal Employees Are Similarly Situated to Plaintiffs.

No law prohibits federal employees from making contributions in federal elections.  Indeed, the applicable regulation expressly provides just the opposite:  "An employee may make a political contribution to a political party, political group, campaign committee of a candidate for public office in a partisan election and multicandidate political committee of a Federal labor or Federal employee organization."  5 C.F.R. § 734.208(a).  There are special rules in 5 C.F.R. § 734.401 for employees of seventeen sensitive agencies, such as the FEC, the FBI, and the CIA, but 5 C.F.R. § 734.404(a)(4) specifically allows even those employees to do what plaintiffs may not: "Make a financial contribution to a political party, partisan political group, or to the campaign committee of a candidate for partisan political office."

As noted above, 18 U.S.C. § 603 contains a very modest restriction for federal employees: the contributor cannot work for the person "receiving" the contribution.  But making a contribution directly to a presidential election committee, a political party, or a political committee, is not barred.  Far from being a limit on what federal employees may contribute, section 603 is principally aimed at protecting federal employees

34

from being solicited by their supervisors, whose requests they may feel

unable to decline. [4]

In almost all respects, federal employees are similarly situated to

individuals such as plaintiffs who have personal services contracts with

federal agencies.  Both are paid by funds appropriated by Congress, and both

perform work under the direction of the heads of federal agencies and those

who work for them.  As the declarations in this case demonstrate, plaintiffs

and federal employees work literally side-by-side and perform many of the

same duties – and do so interchangeably in many circumstances.  *See* JA

124, ¶ 3; *see also NASA v. Nelson,* 131 S. Ct. 746, 751 (2011) (upholding

background checks for individual contractors with access to federal facilities

because "their duties are functionally equivalent to those performed by civil

servants" who undergo such checks); *Filarsky v. Delia,* 132 S. Ct. 1657,

1665-66 (2012) (citing need for governments to hire part-time personnel to

fill special needs).  Plaintiffs Brown and Miller are retired employees from

the same agency where they now are contractual consultants and do much

---

[4] The concern with supervisors soliciting subordinates is confirmed by
specific federal rules prohibiting such conduct. *See* 5 C.F.R. §
734.208(b)(4)(ii); 5 C.F.R. § 734.303(d); & 5 C.F.R. § 734.302(b)(3).  In
addition, 5 C.F.R. § 734.306 contains time, place, and manner prohibitions
on participation by federal employees in political activities generally, but
none of them would prevent an employee from making a contribution except
in those specific circumstances.

the same work they previously did.  But when they were employees, they could make federal contributions, and now they would be felons if they did so.  Section 441c extends not only to part-time consultants like plaintiff Wagner and to contractor-employees like plaintiffs Miller and Brown, but, as the FEC has admitted, section 441c applies to anyone who has a contract with any federal government entity, including individuals hired as expert witnesses, mediators for the Department of Justice, advisers in medicine, science, and economics, and law professors who serve as reporters to the various rules committees established by the Judicial Conference.  JA 106.

According to the FEC, section 441c is intended to prevent the actuality or appearance of corruption that would arise if individual contractors made political contributions because such contributions might appear to influence the award or renewal of their contracts.  It could be argued that, because employees do not need new contracts or renewals, they have nothing to gain from making contributions or to lose from not making them, which would make the situations not comparable.  But that argument ignores the fact that federal employees are not in a static situation. Employees desire pay raises, promotions, and excellent annual evaluations from their superiors.  They prefer some work locations to others.  Moreover, within a given office, there are better and worse jobs, in terms of the quality

36

of work, the hours when employees must be present, the identity of their

supervisor, and their ability to gain particular experience as a means of

advancing in the future.  And in contrast to contractors like plaintiff Wagner,

for whom the ACUS work is only part time and for a limited duration, or

like plaintiffs Miller and Brown, who are retired employees for whom their

contract work supplements their retirement, full-time federal employees

have a great deal to gain or lose even if their "contracts" cannot readily be

terminated.  Thus, because they too have incentives to please (or not

displease) their supervisors by making "appropriate" political contributions,

federal employees are like individual contractors, especially those like

plaintiffs Brown and Miller who literally work along side of, supervise, or

are supervised by them.  We do not argue that the situations are identical,

but under the strict or at least heightened scrutiny that applies to this Equal

Protection challenge, they are sufficiently close that the FEC must supply a

far greater justification than it has to date to explain why the Constitution

permits Congress to forbid plaintiffs from making contributions in federal

elections, but does not apply a similar ban to federal employees.

*  *  *

*Kramer v. Union Free School District, supra*, strongly supports

plaintiffs' Equal Protection claims.  Although there is no express

37

constitutional provision granting the right to vote for government officials, the *Kramer* Court held that allowing some individuals to vote for elected officials, while denying others that opportunity, had to satisfy strict scrutiny. The election in *Kramer* was for a local school board, but only those who owned or leased property in the school district, or who had children (whether in the public schools or not) could vote.  The plaintiff was a childless stockbroker who lived with his parents, but was otherwise eligible to vote. The Court found the voting exclusion violated Equal Protection because there were no relevant differences between those who were allowed to vote and Mr. Kramer.  Because the right to vote and the right to make contributions to candidates for elected office are both integral parts of the political process, *Kramer* strongly supports plaintiffs' Equal Protection claims here.  Preferring federal employees over individual consultants, or preferring the PACs, stockholders, officers, and employees of contracting corporations over individuals such as plaintiffs, violates Equal Protection. The combination of both makes section 441c doubly unconstitutional as applied to individuals who have contracts with federal agencies.

## II.    BARRING INDIVIDUALS HOLDING FEDERAL CONTRACTS FROM MAKING ANY CONTRIBUTIONS FOR FEDERAL ELECTIONS VIOLATES THE FIRST AMENDMENT.

### A. As a Complete Ban on Fundamental First Amendment Activity, Section 441c Should Be Subject to Strict Scrutiny.

The First Amendment is a general limit on all laws regulating political contributions and expenditures.  *Buckley*, 424 U.S. at 14-23.  In every case in the campaign finance area, the Supreme Court has applied some form of heightened scrutiny, with bans or limits on expenditures subject to the highest level of scrutiny, and limits on contributions subject to a somewhat lesser degree of scrutiny.  *Id*. at 19-23; *see, e.g., Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2817 (2011) ("after finding that the restriction at issue was 'closely drawn' to serve a 'sufficiently important interest,' . . . we have upheld government-imposed limits on contributions to candidates") (citations omitted).  Section 441c is a ban, not just a limit, and it is applicable to individuals with federal contracts, almost all of whom, like plaintiffs, are citizens eligible to vote in federal elections.  It therefore strikes directly at plaintiffs' ability to express their political preferences by contributing to candidates, parties, and independent political committees that support candidates and/or policies that they support.  The closest case is *McConnell v. FEC,* 540 U.S. at 231-32, where, applying heightened scrutiny, the Court struck down a ban on all

39

contributions by persons under the age of 18, which was likewise defended as a prophylactic measure to prevent corruption or the appearance of corruption in the form of evasion of contribution limits.

A complete ban on contributions by any group of voters should be subject to strict scrutiny because it abridges fundamental First Amendment rights. Plaintiffs recognize that *Beaumont* applied the less demanding "closely drawn" standard to the ban at issue there, 539 U.S. at 161-63, and that *Preston v. Leake,* 660 F.3d 726, 735 (4th Cir. 2011), applied that standard to a near-total ban on contributions by registered lobbyists. However, *Citizens United,* which applied strict scrutiny to the ban on for-profit corporate independent expenditures, 558 U.S. at 340, casts doubt on the continued viability of *Beaumont*, at least, as here, where the ban is directed at eligible voters. The *Beaumont* plaintiff was a non-profit corporation, not an individual voter, and, unlike plaintiffs, it was also permitted to have a PAC and to make unlimited independent expenditures. *Compare* 539 U.S. at 162-63, *with* section 441c(b) (excluding individuals from establishing PACs) and 11 C.F.R. § 115.2 (interpreting section 441c to prohibit independent expenditures).[5]

---

[5] Section 441c refers only to contributions, not expenditures, but the FEC construes it to extend to independent expenditures. *See* FEC News Release October 5, 2011, note 1, available at

Furthermore, the reasons why the *Buckley* Court was willing to apply less than strict scrutiny to contribution limits strongly suggest a different treatment here. *Buckley* observed that a *limit* "entails only a marginal restriction upon the contributor's ability to engage in free communication," 424 U.S. at 20, which plainly cannot be said about a ban. The essence of a contribution, said the Court, is the "symbolic act of contributing," with the size of the contribution providing only "a very rough index of the intensity of the contributor's support for the candidate." *Id.* at 20-21. In subjecting limitations to lesser scrutiny, the Court further noted that limits still permit "the symbolic expression of support evidenced by a contribution," *id.* at 21, a rationale that is plainly inapplicable to section 441c.

For these reasons, a complete ban on contributions by individual voters should be subject to strict scrutiny. But regardless of whether the somewhat more relaxed version of heightened scrutiny employed by the Court in *Buckley* (upholding contribution limits), and in *Randall v. Sorrell,* 548 U.S. 230, 253 (2006) (setting aside limits as too low), or even the "closely drawn" standard in *Beaumont*, is applicable, the ban in section 441c

---

http://fec.gov.press2011/20111006postcarey.shtml. Plaintiffs have no interest in making independent expenditures, but if pay-to-play concerns are sufficient to support a contribution ban, as the FEC contends, those concerns would also be sufficient to support a ban on independent expenditures by contractors. But *Citizens United* would clearly foreclose that outcome.

cannot stand. That is because, as the Sixth Circuit recently held in setting

aside a ban on contributions from Medicaid providers, "a state must do more

than merely *recite* a general interest in preventing corruption. What *Buckley*

requires is a demonstration, not a recitation." *Lavin v. Husted,* 689 F.3d 543,

547 (6th Cir. 2012). [6]

### B. The Contribution-Contract Connection Is Too Attenuated to Survive Any Heightened Scrutiny.

Section 441c is not an economic regulation, such as one disallowing

political contributions in a utility's rate base, or a law allocating property tax

burdens. *Cf. Armour v. City of Indianapolis,* 132 S. Ct. 2073 (2012)

(allowing rough justice in tax matters). Rather, the right to make a political

contribution is squarely protected by the First Amendment. Unlike most

other contribution laws applicable to individuals, section 441c does not

limit, but absolutely prohibits plaintiffs from making contributions for

---

[6] The FEC also defends section 441c on an anti-coercion rationale. JA 289,
¶ 11. Even assuming that paternalism has a place in First Amendment
analysis, and even disregarding the fact that section 441c forbids
contributions to independent committees that have no power to coerce any
contractor, prohibiting speech should be a last resort, not the first one. In
this context, that means forbidding those with power to award contracts from
using that power to coerce contributions. Indeed, there are a number of
criminal statutes, such as 18 U.S.C. §§ 601, 603, 606, & 610, that either
already protect contractors as well as federal employees, or could be
amended to do so. There is no basis to believe that direct regulation of
improper conduct will not succeed, at least until it has been tried and found
wanting.

federal elections as long as they have contracts with the federal government. Since Congress apparently believes the limits applicable to all contributors are sufficient to avoid the reality or appearance of corruption for everybody else, defendant has a heavy burden to explain why those limits are not also sufficient as applied to plaintiffs. As the Second Circuit observed in striking down a ban on contributions by lobbyists, "if a contribution limit would suffice where a ban has been enacted, the ban is not closely drawn to the state's interests." *Green Party,* 616 F.3d at 206, n. 14. And in judging whether defendant has sustained that burden, the "Supreme Court has recognized only one interest sufficiently important to outweigh the First Amendment interests implicated by contributions for political speech: preventing corruption or the appearance of corruption." *SpeechNow.org v. FEC,* 599 F.3d 686, 692 (D.C. Cir. 2010) (en banc). Accordingly, there must be at least a substantial reason why a complete ban is needed and why the otherwise applicable limits do not suffice to avoid the appearance of pay-to-play, the asserted rationale for section 441c. The FEC has simply never answered the question of why those limits do not suffice.

Plaintiffs do not argue that the First Amendment prohibits all restrictions on government contractors. Nor does the Court need to go nearly that far to rule for plaintiffs. That is because the lack of fit between

43

section 441c and both the manner in which contracts with the federal
government are awarded – by agency officials who are appointed, not
elected – and the breadth of persons under section 441c that may not receive
contributions from contractors – most of whom have no role in federal
contracting – doom section 441c under the First Amendment.

The starting point for federal contracting is 48 C.F.R. § 1.601 (a),
which provides that federal contracts are awarded at the agency level, with
no role for any elected official to whom contributions might be made.
Although agencies are headed by persons appointed by the President with
the advice and consent of the Senate, there is a separation of functions such
that agency heads, as well as most other political appointees, have nothing to
do with most federal contracts.  Moreover, the established procedures for
awarding contracts preclude improper interference, such as rewarding
contributors with preferences.  Thus, the plaintiffs each explained how their
contracts were awarded in a non-political way.  For example, plaintiff
Brown showed that the process by which contracts are awarded to
individuals at USAID is designed to preclude improper outside influence.
JA 93 (response to Interrogatory No. 2).  Similarly, Professor Schooner
confirmed that the special qualifications and the independence of the

contracting officers at all agencies are vital parts of the contracting process. *See* JA 355, ¶ 23, citing to Schooner deposition.

To be sure, it is *possible* that despite the laws and procedures that take politics out of contracting, *some* individuals may break the rules, and perhaps, if section 441c were a form of economic regulation and did not impinge on plaintiffs' First Amendment rights, it might be sustained on that possibility. But the connection between contributions to persons who have no proper role in awarding federal contracts and the ban in section 441c is simply too attenuated to satisfy the First Amendment. Laws abridging First Amendment rights cannot be based on speculation alone: "it has long been established that the government cannot limit speech protected by the First Amendment without bearing the burden of showing that its restriction is justified." *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777 (1986). Even regarding the more permissive regulation of commercial speech, the Court has held that the "burden is not satisfied by mere speculation or conjecture; rather a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993).

In this respect section 441c is like the ban on contributions by minors set aside in *McConnell*: even if some parents might use their children as unlawful conduits for excess contributions, a total ban on all contributions by minors failed the closely drawn test applied there: "The States have adopted a variety of more tailored approaches  – *e.g.*, counting contributions by minors against the total permitted for a parent or family unit, imposing a lower cap on contributions by minors, and prohibiting contributions by very young children. Without deciding whether any of these alternatives is sufficiently tailored, we hold that the provision here sweeps too broadly." 540 U.S. at 232.  Perhaps a prohibition on making a contribution to an official who is the decision-maker on a government contract that the contributor is currently seeking, or has recently obtained, would be justified as a means of avoiding the appearance of corruption.  However, section 441c is not such a law.[7]

---

[7] Even that kind of a law might be struck down because there is a less restrictive alternative: impose a temporal ban on entering a contract with anyone who has made a contribution to someone who has a role in deciding who is to be awarded that contract.  That kind of law would operate like a recusal statute, not a ban on speech.  *Compare Caperton v. A. T. Massey Coal Co.,* 556 U.S. 868 (2009) (Due Process recusal of judge based mainly on very large independent expenditures that could not constitutionally be limited).  That is how the rule upheld in *Blount* operated: municipal securities brokers were prohibited from engaging in that business for two years after contributing more than $250 to officials from whom they were seeking that business. 61 F.3d at 939-40.

The FEC also relies on decisions sustaining state and local laws banning contributions by contractors, *see* JA 303-10, ¶¶ 46, 51, 58. However, those cases are readily distinguishable because the connection between the contract award and the contribution is much closer than it is in the federal system.  In the federal system, only Members of Congress and the President and Vice President are elected, and they have no direct role in awarding contracts.  By contrast, many more state and local officials are elected, and many of those officials have important roles in awarding contracts.  Indeed, in most of the litigated cases, the ban applied only to persons actually involved in the contracting process.  Thus, in *Blount v. SEC,* the rule was limited to contributions to specific officials of the issuer (*i.e.,* the persons who decide who gets the business), and in that respect it was even more narrowly tailored than the "branch specific" law in *Green Party* that was enacted only after a series of contractor-based scandals.  616 F. 3d at 193-94.  It is true that section 441c has been in effect since 1940, and so recent evidence of the kind supporting the ban in *Green Party* is unlikely to exist.  However, the absence of *any* examples of even attempted pay-to-play involving otherwise lawful contributions made to obtain federal contracts strongly suggests that the existing rules on federal procurement already protect the federal interest in avoiding the appearance of corruption.

*See Green Party*, 616 F.3d at 206-07 (rejecting ban on contributions by lobbyists because of absence of evidence of improper influences).

Finally, even if section 441c was defensible when it was enacted, it cannot withstand this First Amendment challenge today. Not only has the Holmesian view of what the Government may demand of those who work for it been rejected, *see supra* at 7-8, but in 1976 the Court in *Buckley* first applied the First Amendment to political contributions. Moreover, the sea-changes in federal procurement law and practice described *supra* at 12-13, have so fundamentally altered that process that whatever dangers there may have been that contributions would influence the awarding of federal contracts in 1940 have been so diminished that section 441c can no longer be sustained as a means of avoiding even the appearance of pay-to-play. In short, as Justice Brandeis observed, "A statute valid when enacted may become invalid by change in the conditions to which it is applied." *Nashville, C. & St. L. Ry. v. Walters,* 294 U.S. 405, 415 (1935).[8]

The most recent example of this principle is *Shelby County, Ala. v. Holder*, No. 12-96, 2013 WL 3184629 (U.S. June 25, 2013). The formula

---

[8] The Supreme Court noted probable jurisdiction in *McCutcheon v. FEC,* No. 12-536, on February 19, 2013. The principal claim there is that certain overall contribution limits that had been upheld in 1976 in *Buckley* were now unconstitutional because of subsequent changes in FECA that undermined the asserted rationales for those limits.

for covered jurisdictions in section 4 of the Voting Rights Act, which had

been sustained on three prior occasions, and which had remained largely

unchanged since 1965, was overturned because times had changed and the

formula had not.  As the Court explained, the Act imposes "'current

burdens' [that] must be justified by 'current needs.'"  *Id*. at *14 (quoting

*Northwest Austin Municipal Util. Dist. No. One v. Holder*, 557 U.S. 193,

203-204 (2009)).

　　　Moreover, unlike section 441c, the Voting Rights Act had been the

subject of extensive congressional hearings and fact finding as recently as

2006, but that still was not enough to overcome the failure to update the

formula.  In addition, there is a "bailout" provision under the Voting Rights

Act, but there is nothing like that for section 441c, such as exclusions for

small contracts or small contributions.  Finally, as the dissent pointed out,

the Act was passed pursuant to Congress' express and admittedly broad

powers under the Fifteenth Amendment, *id*. at *24-25, and there is no

similar express grant of power to regulate political speech.  To the contrary,

the First Amendment expressly *limits* Congress' authority to do that.

　　　*Shelby County* was not an Equal Protection case, but the majority

opinion has equal protection overtones in its discussion of both how some

covered jurisdictions are no longer serious offenders and how some

49

uncovered jurisdictions have been found to violate the Act. *See Romer v. Evans,* 517 U.S. 620, 633 (1996) (applying rational basis review to set aside provision "at once too narrow and too broad"). In that respect it resonates with plaintiffs' arguments that section 441c is both over- and under-inclusive, to which we now turn. *See Citizens United,* 558 U.S. at 362 (relying on both under- and over-inclusiveness in rejecting shareholder protection rationale as grounds for a ban on independent expenditures).

### C.  Section 441c Is Over-Inclusive.

Another reason why section 441c cannot withstand First Amendment scrutiny is that it reaches both contractors and contributions for which there is no significant risk of even the appearance of pay-to-play. *See Lavin v. Husted,* 689 F.3d at 548 (setting aside contribution ban as "vastly more restrictive than necessary to achieve its stated goal"). The statement in *Buckley* (which upheld only limits, not bans, on contributions) that Congress may proceed "one step at a time," 424 U.S. at 105, does not mean that the steps Congress took when it amended section 441c in 1976 to add subsections 441c(b) & (c) regarding contractor PACs, and made major changes in government procurement laws beginning in 1948, can be ignored by the courts. The FEC's approach might be justified if section 441c were ordinary economic regulation, but it does not suffice to uphold a ban on First

Amendment activities.  Under either strict scrutiny or the closely drawn

standard, courts may not disregard obvious, modest, and less restrictive

alternatives that would significantly reduce the harm to plaintiffs, while not

undermining the asserted pay-to-play rationale.  *See, e.g., McConnell*, 540

U. S. at 232. There are several obvious ways in which section 441c could be

made less restrictive without undermining its purpose.

For example, section 441c unnecessarily bans contributions to entities

that have no possible role in federal contracting today.  It applies not only to

the President and Members of Congress – as well as challengers who have

no current power even in theory – but also to all political parties (including

minor and new parties and their candidates, as defined by 26 U.S.C. § 9002

(7) & (8)), and to ideological political committees, such as those formed by

environmental groups, Planned Parenthood, the NRA, and the various Right

to Life organizations. Unlike elected officials who might have the theoretical

power to influence a contract, officials of those entities plainly have no

ability to affect the award of any contract, let alone those of plaintiffs.  *Cf.*

*Citizens Against Rent Control v. Berkeley*, 454 U.S. 290, 296-99 (1981)

(distinguishing contributions to a candidate from contributions to ballot-

measure committees because such committees have no power to make

governmental decisions); *Blount* 61 F.3d at 947 (prohibition applies only to

"officials who might influence the award of negotiated municipal bond underwriting contracts"). Similarly, in *Dallman,* 225 P.3d at 627, a law that reached contributions to political parties and to all candidates for office, regardless of their connection to the contributor's actual or potential contract, was set aside because it incorrectly assumed that "a small contribution to a candidate for the general assembly automatically leads to a public perception that the donor will receive some quid pro quo benefit from a city or special district with which the donor holds a sole source contract."

Section 441c also lacks ameliorating provisions included in other statutes aimed at preventing pay-to-play. For example, the New York City law upheld in *Ognibene v. Parkes,* 671 F. 3d 174 (2nd Cir.), *cert. denied,* 133 S. Ct. 28 (2012), has a number of less restrictive features absent from section 441c. First, the law does not ban, but only limits, contributions by certain contractors. *Id.* at 179-80. Second, the law applies only to contracts worth more than $100,000, which would have excluded plaintiff Wagner. *Id.* at 180. The law does not appear to apply to contractors like plaintiffs Brown and Miller (although that is not entirely clear since no one in their position was a plaintiff). Moreover, the challenged law was the result of a series of incremental changes, backed by studies and reports that followed on the heels of local scandals, *id.* at 178, and was carefully crafted to avoid

the problems of over and under-inclusion found in section 441c.  Plaintiffs
take no position on whether *Ognibene* was correctly decided or whether a
law like that, at the federal level, would be constitutional.  But its vastly-
reduced reach further demonstrates why section 441c is not closely drawn.

Similarly, the Colorado law in *Dallman* had a much narrower scope
than does section 441c: it applied only to contracts for which no more than
three bids were received, and it covered only contracts above $100,000
(indexed for inflation).  225 P.3d at 618.  Even then, the law did not survive
closely drawn scrutiny because it applied to contracts in rural areas where
the product or service could sometimes be obtained from only one company.
*Id.* at 626-27.[9]

Even *Preston, supra*, which upheld a near-total ban on contributions
by registered lobbyists in North Carolina, does not help the FEC.  The
decision turned on a series of recent campaign finance scandals involving

---

[9] Excluding sole-source contracts is sensible because the requirements to
enter them are sufficiently rigorous that they provide reasonable assurances
of eliminating the possibility of the kind of favoritism that pay-to-play might
undermine and because in many such cases the government initiates the
contact. JA 218-19, pp. 139-41. The individual may be an expert (like
plaintiff Wagner or Jonathan Tiemann), a mediator (where a private party
must also consent and pay, JA 216, p. 132), or an investigator for the
agency, and the individual does not even know that there is a possible
contract under consideration.  In such cases the notion that a political
contribution even to a candidate for President, let alone to independent
political committees, would influence the selection of a contractor is beyond
fanciful.

elected state officials and lobbyists who sought to influence them. 660 F.3d

at 729-30.  That rationale is inapplicable here because plaintiffs are

essentially government employees who have no means to influence their

contracts by making contributions to any of the prohibited entities within the

limits applicable to everyone.  But most significant for the over-

inclusiveness argument is that, unlike under section 441c, lobbyists in North

Carolina are entitled to contribute to PACs (up to $4000 under N.C. Stat.

163-278.13(a)) and to recommend which candidates should receive their

contributions.  660 F.3d at 740**.**

Another example is the rule in *Blount v. SEC* that excluded contracts

where there was open competitive bidding and did not count contributions

up to $250.  61 F.3d at 940 & n.1.  The concept of distinguishing small

contributions is already a feature of FECA because only contributions

totaling more than $200 in an election cycle must be reported to the FEC and

the name of the contributor publicly disclosed.  2 U.S.C. §§ 431(13);

434(b)(3)(A). That exclusion strongly supports the conclusion that no

reasonable person would believe that a contribution of $200 or less could

influence the award of a federal contract, even assuming that the identity of

the contributor were made known to the recipient.  Because section 441c

contains none of the exceptions found in these other statutes, and because it

54

bans contributions to entities having no connection with federal contracting, it is vastly over-inclusive and cannot stand under the First Amendment.

Finally, section 441c applies no matter what the source of funds is for the contribution.  11 C.F.R. § 115.5.  In that respect it is like the condition struck down by the Court on First Amendment grounds in *Agency for Intern. Development v. Alliance for Open Society Intern., Inc.,* 133 S. Ct. 2321 (2013), that applied not to funds received from the government, but to funds from any source.  That decision also undermines the FEC's theory that the ban is constitutional because plaintiffs "have chosen" to become government contractors (JA 131, ¶ 2), since the plaintiffs in *Alliance* had equally chosen to accept Government funding and did not thereby lose their First Amendment rights to spend their own funds as those chose.

## D. Section 441c Is Under-Inclusive.

Section 441c also runs afoul of the First Amendment because it is significantly under-inclusive by failing to include large categories of persons for whom the pay-to-play rationale is at least as strong as it is for individual contractors such as plaintiffs.  An under-inclusiveness argument does not fail here simply because expanding section 441c would restrict more speech. The Supreme Court has recognized the legitimacy of an under-inclusiveness inquiry in a First Amendment challenge, *see Austin v. Michigan Chamber of*

*Commerce,* 494 U.S. 652, 665-666 (1990), *overruled on other grounds by Citizens United*, *supra,* although ultimately finding that there were significant differences between the included and excluded entities. *See also City of Ladue v. Gilleo*, 512 U.S. 43, 52-53 (1994) (striking down ban on signs outside a home in part because it was under-inclusive based on the ordinance's asserted rationale). In other words, in First Amendment cases, where "precision of regulation must be the touchstone," *NAACP v. Button*, 371 U.S. 415, 438 (1963), it is not a defense to a claim of under-inclusion that a broader law would be more restrictive of speech where that broader law would be more consistent with the stated rationale than the law being challenged.

Procurement contracts are only one of the important ways the Government spends congressionally appropriated funds, which is the lynchpin of section 441c. In 2 C.F.R. § 180.970, the Office of Management and Budget provides examples of other uses of such funds; among the most prominent examples are grants, which are indistinguishable from contracts with regard to the concern that animates section 441c – preventing undue influence on decisions about who receives federal funding. In both situations, the Government has agreed to pay what may be a substantial sum of money to a person outside the Government to undertake certain activities

56

the Government wants performed. To be sure, the agency awarding a grant will not receive personal services, goods, or materials as it would under a contract, but the grant will advance a governmental purpose, and one or more human beings will use the money to carry out the activity that the Government wants performed.

Applying the theory of section 441c, a person seeking a grant might believe that the chance of obtaining it would be enhanced by making a contribution in a federal election. But grants are not covered by section 441c or any similar law even though a 2003 study found nearly 3 million individuals providing services under federal grants. http://www.brookings.edu/~/media/research/files/articles/2003/9/05politics %20light/light20030905.pdf. Professor Schooner testified that the Government gives away more money in grants in most years than it expends for contracts (JA 193, pp. 38-39), yet only the latter are covered by section 441c. He also explained that the protections against improper influence under federal contracting law are inapplicable to federal grants. JA 193-94, pp. 38-42. [10]

---

[10] The New York City law at issue in *Ognibene* applied to grants in excess of $100,000. 671 F.3d at 180. Plaintiff Wagner is also a co-grantee from the National Science Foundation under a federal grant in the amount of $45,721, JA 51, ¶ 4, but that does not preclude her from making political contributions.

Other federal financial benefits such as loans, loan guarantees,

subsidies, and "payments for specified uses," 2 C.F.R. § 180.970, likewise

have no effect on recipients' ability to make campaign contributions despite

their potential for the reality or appearance of a quid pro quo.  Loans and

guarantees include those made for home purchases by the VA or FHA, as

well as for "small businesses" and "economic injury disasters," both of

which can be as much as $2 million. http://www.govloans.gov/loans/loan-

details/1497; http://www.govloans.gov/loans/loan-details/1504.  Also

included are "business and industrial loans" that can be as large as $40

million. http://www.govloans.gov/loans/loan-details/4735.

Pay-to-play possibilities also include admission to one of the tuition-

free military academies.  *See, e.g.* 10 U.S.C. § 6954(a); United States Naval

Academy, http://www.usna.edu/Admissions/steps4.htm.  Among the persons

who can make the required nominations are Members of Congress and the

President and Vice President, to whom contributions can actually be made

(unlike the agency officials that hired plaintiffs).  The failure to include

them, even though they have similar pay-to-play potentials as government

contracts, further suggests that the rationale offered to defend section 441c is

not sufficiently tailored to sustain its constitutionality against this First Amendment challenge.[11]

There is also the well-known practice by which individuals, who hope to be rewarded with government positions, including coveted ambassadorships, make large contributions to support a presidential candidate or assist the campaign by bundling contributions from others. *See* T.W. Farnam, "Obama Gives Administration Jobs to Some Big Fundraisers," Washington Post, March 8, 2012, A15; Mark Landler, "Obama Rewarded '08 Fundraisers," New York Times, July 25, 2012, A14 (80% of bundlers of $500,000 or more appointed to Administration positions). These practices are much more serious examples of pay-to-play than contributions by individuals like plaintiffs, yet they are perfectly legal. Therefore, like the ban at issue in *Republican Party of Minnesota v. White,* 536 U.S. 765, 780 (2002), the ban here is "so woefully underinclusive as to render belief in that purpose a challenge to the credulous."

---

[11] Contributions can also influence discretionary decisions involving presidential pardons for which letters from Members of Congress can be persuasive. *See, e.g.,* http://www.propublica.org/article/pardon-attorney-torpedoes-plea-for-presidential-mercy (citing support of Senator Dick Durbin to obtain only Obama commutation). And, as the case of Marc Rich illustrates, although there are real incentives for individuals seeking pardons to make generous contributions, *see* http://www.propublica.org/article/the-shadow-of-marc-rich, no ban like 441c applies to them, even if they are convicted felons who cannot vote.

## E. The Other Arguments in Support of Section 441c Are Unavailing.

In earlier filings, the FEC attempted to downplay the impact of the ban by suggesting that plaintiffs can express their preferences in federal elections by hosting fundraisers for candidates and soliciting contributions for them, as well as providing other valuable services pursuant to 2 U.S.C. §§ 431(8)(B)(ii) & (iv).  JA 180, ¶¶ 138-141.  But on remand, its proposed findings omit those paragraphs from their prior place in Section IX. *See* JA 329. Even though the FEC has apparently changed its mind since its earlier filings, the law remains unchanged.  It remains true today that plaintiffs can host fundraisers at which millions of dollars are raised, but may not contribute $100 themselves. It is understandable that the FEC would now omit this alternative because the argument that plaintiffs can host fundraisers, where very large contributors can be invited and solicited, without raising the pay-to-play specter, but that contributing $10 to the same candidate would create the appearance of improper influence, has it precisely backwards.  This does not show why contributions can be banned; it shows why the ban cannot survive meaningful scrutiny.[12]

---

[12] The SEC rule in *Blount* addressed this very problem and expressly forbade covered persons from engaging in fundraising, recognizing that fundraisers can be at least as beneficial to the candidate as contributions.  61 F.3d at 940.

More fundamentally, the answer to the FEC's argument is that the Government does not have the right to determine in what manner and by what means individuals will exercise their First Amendment rights. That is the dispositive lesson of *Texas v. Johnson,* 491 U.S. 397 (1989), where the defendant had an almost infinite number of ways to express his displeasure with the Government besides burning an American flag, yet the Court struck down the law forbidding him from choosing that method of making his views known. Moreover, if alternatives to making contributions were a defense to a claim that the First Amendment was violated by a limit on contributions, many Supreme Court cases would have been much shorter, and some, such as *Randall v. Sorrell, supra,* would have come out the opposite way. Indeed, under the FEC's theory, no limit or even ban on contributions would ever be struck down because there are always alternative ways to support a candidate, party, or cause.

Finally, it might be argued that Congress has made a "reasonable legislative judgment" that the contribution limits applicable to all individuals were not adequate to protect the federal interest allegedly advanced by applying the ban in section 441c to individual federal contractors. The main difficulty with that assertion is that all legislative judgments are subordinate to the Constitution. Moreover, that argument assumes that Congress

61

actually considered the issue, but there is nothing to support that hypothesis.

Congress imposed the ban on contractor contributions in 1940, and the only

changes to that provision since then have made it easier for corporations to

make contributions, through their PACs.  Even when Congress implemented

the current contribution system in 1971, and imposed contribution limits on

all individuals, it never considered making those limits applicable to

individual contractors.  And when it loosened restrictions in the Hatch Act

after 1940, it never considered loosening or eliminating the ban in section

441c applicable to plaintiffs and others.  JA 143-44, ¶¶ 34-35.  *Cf. Miller v.*

*Alabama*, 132 S. Ct. 2455, 2472 (2012) (mandatory sentences of life without

parole for juveniles resulting from the interaction of separate statutes

enacted at different times make it "impossible to say whether a legislature

had endorsed a given penalty for children (or would do so if presented with

the choice)").  The continued adherence to an absolute ban for individuals

under section 441c is in marked contrast to the "careful adjustment of the

federal electoral laws" upheld in *FEC v. National Right to Work Committee,*

459 U.S. 197, 209 (1982).

        In sum, even if a considered legislative judgment could overcome the

kind of constitutional problems that exist here, the special ban imposed on

individual contractors is entirely one of happenstance that has never been

considered, let alone reconsidered in light of other directly relevant changes in campaign finance and federal procurement law since the ban was enacted in 1940.  The First Amendment does not dictate any single change, or even a combination of changes, that are needed to save section 441c, but the failure to include any ameliorating features, or to include within its reach other federal programs with comparable pay-to-play potential, demonstrates why the law is not closely enough drawn to be upheld.  As the Supreme Court observed in a related context in *United States v. National Treasury Employees Union,* 513 U.S. 454, 477 (1995): "The speculative benefits the honoraria ban may provide the Government are not sufficient to justify this crudely crafted burden on respondents' freedom to engage in expressive activities."

## CONCLUSION

For the foregoing reasons, judgment should be entered for plaintiffs.

Respectfully submitted,

Alan B. Morrison
George Washington University
   Law School
2000 H Street NW
Washington D. C. 20052
(202) 994 7120
(202) 994 5157 (Fax)
abmorrison@law.gwu.edu

Arthur B. Spitzer
American Civil Liberties Union
   of the Nation's Capital
4301 Connecticut Ave, N.W., Suite 434
Washington, D.C. 20008
(202) 457 0800
(202) 457 0805 (fax)
artspitzer@aclu-nca.org

Counsel for Plaintiffs

July 3, 2013

**No. 13-5162**

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Civil Procedure 32(a)(7)(C), I hereby

certify this 3rd day of July 2013 that the foregoing Brief of Plaintiffs-

Appellants, has a typeface of 14 points and, as calculated by my word-

processing software (Microsoft Word), contains 13,943 words.

/s/ Alan B. Morrison
Alan B. Morrison
George Washington University
    Law School
2000 H Street NW
Washington D. C. 20052
(202) 994 7120

No. 13-5162

**CERTIFICATE OF SERVICE**

I hereby certify that I served and filed the Joint Appendix and Brief of

the Plaintiffs this 3rd day of July 2013 with the Clerk of the Court of United

States Court of Appeals for the D.C. Circuit by using the Court's CM/ECF

system.  Service was made on the following through the CM/ECF system:

Seth Nesin                                      J. Gerald Hebert
Federal Election Commission                     The Campaign Legal Center
999 E Street, NW                                215 E. Street, NE
Washington, DC 20463                            Washington DC 20002
Counsel for the FEC                             Counsel for Amici


Copies of the Brief and Joint Appendix were also served by first class

mail on Counsel for the FEC and Amici on this date.

/s/ Alan B. Morrison
Alan B. Morrison
George Washington University
    Law School
2000 H Street NW
Washington D. C. 20052
(202) 994 7120

# STATUTORY ADDENDUM

## 2 U.S.C. § 441c, Contributions by government contractors

(a) Prohibition
It shall be unlawful for any person--

(1) who enters into any contract with the United States or any department or agency thereof either for the rendition of personal services or furnishing any material, supplies, or equipment to the United States or any department or agency thereof or for selling any land or building to the United States or any department or agency thereof, if payment for the performance of such contract or payment for such material, supplies, equipment, land, or building is to be made in whole or in part from funds appropriated by the Congress, at any time between the commencement of negotiations for and the later of (A) the completion of performance under; or (B) the termination of negotiations for, such contract or furnishing of material, supplies, equipment, land, or buildings, directly or indirectly to make any contribution of money or other things of value, or to promise expressly or impliedly to make any such contribution to any political party, committee, or candidate for public office or to any person for any political purpose or use; or

(2) knowingly to solicit any such contribution from any such person for any such purpose during any such period.

(b) Separate segregated funds

This section does not prohibit or make unlawful the establishment or administration of, or the solicitation of contributions to, any separate segregated fund by any corporation, labor organization, membership organization, cooperative, or corporation without capital stock for the purpose of influencing the nomination for election, or election, of any person to Federal office, unless the provisions of section 441b of this title prohibit or make unlawful the establishment or administration of, or the solicitation of contributions to, such fund. Each specific prohibition, allowance, and duty applicable to a corporation, labor organization, or separate segregated

i

fund under section 441b of this title applies to a corporation, labor organization, or separate segregated fund to which this subsection applies.

(c) "Labor organization" defined

For purposes of this section, the term "labor organization" has the meaning given it by section 441b(b)(1) of this title.

## 2 U.S.C. § 441b, Contributions or expenditures by national banks, corporations, or labor organizations

(a) In general

It is unlawful for any national bank, or any corporation organized by authority of any law of Congress, to make a contribution or expenditure in connection with any election to any political office, or in connection with any primary election or political convention or caucus held to select candidates for any political office, or for any corporation whatever, or any labor organization, to make a contribution or expenditure in connection with any election at which presidential and vice presidential electors or a Senator or Representative in, or a Delegate or Resident Commissioner to, Congress are to be voted for, or in connection with any primary election or political convention or caucus held to select candidates for any of the foregoing offices, or for any candidate, political committee, or other person knowingly to accept or receive any contribution prohibited by this section, or any officer or any director of any corporation or any national bank or any officer of any labor organization to consent to any contribution or expenditure by the corporation, national bank, or labor organization, as the case may be, prohibited by this section.

(b) Definitions; particular activities prohibited or allowed

(1) For the purposes of this section the term "labor organization" means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

(2) For purposes of this section and section 79l(h) of Title 15, the term "contribution or expenditure" includes a contribution or expenditure, as those terms are defined in section 431 of this title, and also includes any direct or indirect payment, distribution, loan, advance, deposit, or gift of money, or any services, or anything of value (except a loan of money by a national or State bank made in accordance with the applicable banking laws and regulations and in the ordinary course of business) to any candidate, campaign committee, or political party or organization, in connection with any election to any of the offices referred to in this section or for any applicable electioneering communication, but shall not include (A) communications by a corporation to its stockholders and executive or administrative personnel and their families or by a labor organization to its members and their families on any subject; (B) nonpartisan registration and get-out-the-vote campaigns by a corporation aimed at its stockholders and executive or administrative personnel and their families, or by a labor organization aimed at its members and their families; and (C) the establishment, administration, and solicitation of contributions to a separate segregated fund to be utilized for political purposes by a corporation, labor organization, membership organization, cooperative, or corporation without capital stock.

(3) It shall be unlawful--

(A) for such a fund to make a contribution or expenditure by utilizing money or anything of value secured by physical force, job discrimination, financial reprisals, or the threat of force, job discrimination, or financial reprisal; or by dues, fees, or other moneys required as a condition of membership in a labor organization or as a condition of employment, or by moneys obtained in any commercial transaction;

(B) for any person soliciting an employee for a contribution to such a fund to fail to inform such employee of the political purposes of such fund at the time of such solicitation; and

(C) for any person soliciting an employee for a contribution to such a fund to fail to inform such employee, at the time of such solicitation, of his right to refuse to so contribute without any reprisal.

(4)(A) Except as provided in subparagraphs (B), (C), and (D), it shall be unlawful--

iii

(i) for a corporation, or a separate segregated fund established by a corporation, to solicit contributions to such a fund from any person other than its stockholders and their families and its executive or administrative personnel and their families, and

(ii) for a labor organization, or a separate segregated fund established by a labor organization, to solicit contributions to such a fund from any person other than its members and their families.

(B) It shall not be unlawful under this section for a corporation, a labor organization, or a separate segregated fund established by such corporation or such labor organization, to make 2 written solicitations for contributions during the calendar year from any stockholder, executive or administrative personnel, or employee of a corporation or the families of such persons. A solicitation under this subparagraph may be made only by mail addressed to stockholders, executive or administrative personnel, or employees at their residence and shall be so designed that the corporation, labor organization, or separate segregated fund conducting such solicitation cannot determine who makes a contribution of $50 or less as a result of such solicitation and who does not make such a contribution.

(C) This paragraph shall not prevent a membership organization, cooperative, or corporation without capital stock, or a separate segregated fund established by a membership organization, cooperative, or corporation without capital stock, from soliciting contributions to such a fund from members of such organization, cooperative, or corporation without capital stock.

(D) This paragraph shall not prevent a trade association or a separate segregated fund established by a trade association from soliciting contributions from the stockholders and executive or administrative personnel of the member corporations of such trade association and the families of such stockholders or personnel to the extent that such solicitation of such stockholders and personnel, and their families, has been separately and specifically approved by the member corporation involved, and such member corporation does not approve any such solicitation by more than one such trade association in any calendar year.
(5) Notwithstanding any other law, any method of soliciting voluntary contributions or of facilitating the making of voluntary contributions to a

iv

separate segregated fund established by a corporation, permitted by law to corporations with regard to stockholders and executive or administrative personnel, shall also be permitted to labor organizations with regard to their members.

(6) Any corporation, including its subsidiaries, branches, divisions, and affiliates, that utilizes a method of soliciting voluntary contributions or facilitating the making of voluntary contributions, shall make available such method, on written request and at a cost sufficient only to reimburse the corporation for the expenses incurred thereby, to a labor organization representing any members working for such corporation, its subsidiaries, branches, divisions, and affiliates.

(7) For purposes of this section, the term "executive or administrative personnel" means individuals employed by a corporation who are paid on a salary, rather than hourly, basis and who have policymaking, managerial, professional, or supervisory responsibilities.

(c) Rules relating to electioneering communications [omitted]

## 2 U.S.C. § 432(e) (5)

The name of any separate segregated fund established pursuant to section 441b(b) of this title shall include the name of its connected organization.

## 18 U.S.C. § 601. Deprivation of employment or other benefit for political contribution

(a) Whoever, directly or indirectly, knowingly causes or attempts to cause any person to make a contribution of a thing of value (including services) for the benefit of any candidate or any political party, by means of the denial or deprivation, or the threat of the denial or deprivation, of--

(1) any employment, position, or work in or for any agency or other entity of the Government of the United States, a State, or a political subdivision of a State, or any compensation or benefit of such employment, position, or work; or

(2) any payment or benefit of a program of the United States, a State, or a political subdivision of a State;

v

if such employment, position, work, compensation, payment, or benefit is provided for or made possible in whole or in part by an Act of Congress, shall be fined under this title, or imprisoned not more than one year, or both.

## 18 U.S.C. § 603.  Making political contributions

(a) It shall be unlawful for an officer or employee of the United States or any department or agency thereof, or a person receiving any salary or compensation for services from money derived from the Treasury of the United States, to make any contribution within the meaning of section 301(8) of the Federal Election Campaign Act of 1971 to any other such officer, employee or person or to any Senator or Representative in, or Delegate or Resident Commissioner to, the Congress, if the person receiving such contribution is the employer or employing authority of the person making the contribution. Any person who violates this section shall be fined under this title or imprisoned not more than three years, or both.

## 18 U.S.C. § 606.  Intimidation to secure political contributions

Whoever, being one of the officers or employees of the United States mentioned in section 602 of this title, discharges, or promotes, or degrades, or in any manner changes the official rank or compensation of any other officer or employee, or promises or threatens so to do, for giving or withholding or neglecting to make any contribution of money or other valuable thing for any political purpose, shall be fined under this title or imprisoned not more than three years, or both.

## 18 U.S.C. § 610. Coercion of political activity

It shall be unlawful for any person to intimidate, threaten, command, or coerce, or attempt to intimidate, threaten, command, or coerce, any employee of the Federal Government as defined in section 7322(1) of title 5, United States Code, to engage in, or not to engage in, any political activity, including, but not limited to, voting or refusing to vote for any candidate or measure in any election, making or refusing to make any political contribution, or working or refusing to work on behalf of any candidate. Any person who violates this section shall be fined under this title or imprisoned not more than three years, or both.

**5 C.F.R. § 734.208(a).**

An employee may make a political contribution to a political party, political group, campaign committee of a candidate for public office in a partisan election and multicandidate political committee of a Federal labor or Federal employee organization.

**48 C.F.R. 1.601 General.**

(a) Unless specifically prohibited by another provision of law, authority and responsibility to contract for authorized supplies and services are vested in the agency head. The agency head may establish contracting activities and delegate broad authority to manage the agency's contracting functions to heads of such contracting activities. Contracts may be entered into and signed on behalf of the Government only by contracting officers. In some agencies, a relatively small number of high level officials are designated contracting officers solely by virtue of their positions. Contracting officers below the level of a head of a contracting activity shall be selected and appointed under 1.603.

**48 C.F.R. 1.603–1 General.**

Subsection 414(4) of title 41, United States Code, requires agency heads to establish and maintain a procurement career management program and a system for the selection, appointment, and termination of appointment of contracting officers. Agency heads or their designees may select and appoint contracting officers and terminate their appointments. These selections and appointments shall be consistent with Office of Federal Procurement Policy's (OFPP) standards for skill-based training in performing contracting and purchasing duties as published in OFPP Policy Letter No. 05–01, Developing and Managing the Acquisition Workforce, April 15, 2005.